# UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF WASHINGTON

## AT TACOMA

| | |
|---|---|
| BUILDING INDUSTRY ASSOCIATION OF WASHINGTON; AIR AMERICA INC.; AIREFCO INC.; BOA CONSTRUCTION CO.; COMPLETE DESIGN INC.; CVH INC.; ENTEK CORP., FAMILY HOME INVESTMENTS CORP.; SADLER CONSTRUCTION INC.; TRACY CONSTRUCTION CO., <br><br> Plaintiffs, <br><br> v. <br><br> WASHINGTON STATE BUILDING CODE COUNCIL, <br><br> Defendant, <br><br> And <br><br> NW ENERGY COALITION, SIERRA CLUB, WASHINGTON ENVIRONMENTAL COUNCIL and NATURAL RESOURCES DEFENSE COUNCIL, <br><br> Defendant/Intervenors | No.  3:10-CV-05373-RJB <br><br> PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO STATE DEFENDANT AND DEFENDANT-INTERVENORS' JOINT MOTION FOR SUMMARY JUDGMENT <br><br> NOTE ON MOTION CALENDAR: FRIDAY, JAN. 7, 2011 |

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

Introduction

Plaintiffs hereby respond to Defendants' Motion for Summary Judgment and bring a

concomitant Motion for Summary Judgment so that this matter can be promptly resolved.

This case concerns the narrow legal issue of whether Chapter 9 of Washington's 2009 Building

Energy Code is expressly preempted by federal law. All parties agree the issue presented is

primarily legal and there is no need for further factual development.

Defendants spend a large amount of their 45-page Motion for Summary Judgment

hyperbolizing about the wisdom of energy conservation in general. This lawsuit is not a

referendum on national energy policy. It is simply a question of whether the Washington State

Building Code Council overstepped its authority when it purported to adopt regulations that

compel thousands of small business across the state to design and construct single-family

residences in a manner that exceeds federal requirements.

Factual Background

This case involves a single chapter of the Washington Administrative Code,

enumerated in WAC 51-11-0900 (chapter 9). Chapter 9 provides a list of purported "options"

with which builders must comply when building a new home. Each "option" lists a purported

energy saving feature that is worth anywhere from negative one to two credits. The builder

must pick an option or combination of "options" to obtain a minimum of one credit. Exhibits

A and F to the Declaration of Timothy M. Harris (Chapter 9 and Table 1).

Defendant Building Code Council voted to approve the addition of Chapter 9, along

with other updates to the energy code (2009 energy code), on Nov. 20, 2008, with an effective

date of July 1, 2010.

RESPONSE AND MOTION FOR
SUMMARY JUDGMENT

2

**GOODSTEIN LAW GROUP PLLC**
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

1      1.     Effective Date Delay

2      The effective date, however, was ultimately delayed.  On June 8, 2010, Governor

3  Christine Gregoire sent a letter to the Building Code Council, requesting a new effective date

4  of April 1, 2011.  According to the Governor's letter, "I believe a temporary delay is necessary

5  to allow the construction industry to stabilize.  We cannot risk further delay of our state

6  recovery, or worse, a deepening recession.  The needs of our communities and families for job,

7  and a healthy economy, must take precedent."  Exhibit B to the Declaration of Timothy M.

8  Harris.

9

10     The Council subsequently extended the effective date to January 1, 2011.  In the rule-

11 making order changing the effective date, Defendant State Building Council stated "extending

12 the effective date will avoid unintended consequences, and will provide economic relief to the

13 state's construction industry and property owners from rising costs at a time when the State's

14 economy is suffering;" and "[the original effective date] could ultimately result in undue

15 expense for residential and commercial construction under the 2009 Energy Code.  The

16 Council finds this may be an economic burden that may jeopardize the state's economic

17 recovery . . . ."  Exhibit C to the Declaration of Timothy M. Harris.

18     2.     Three Pathways

19     Under the 2009 building energy code, which is currently set to become effective next

20 month, the builder begins by choosing one of three mandatory compliance pathways:  a

21 systems analysis in Chapter 4; a building envelope performance pathway in Chapter 5, and a

22 prescriptive requirements pathway in Chapter 6.  Each of those pathways is ostensibly

23 designed to achieve a total fifteen percent increase in energy efficiency.  Chapter 4 involves an

1  expensive computer simulation to demonstrate the home design uses less energy than a code-

2  defined target home to meet the code's energy efficiency goals. Declaration of Ted Clifton at

3  7.

4      Under Chapters 5, a builder must improve the energy efficiency of a home exclusively

5  through improvements to the building envelope. Chapter 5 requires an energy improvement of

6  seven percent, with the additional eight percent energy savings ostensibly met by compliance

7  with chapter 9. Under Chapter 6, builders must comply with prescriptive requirements for

8  various components or systems, and must also comply with Chapter 9.

9

10     3.     Chapter 9's "Option" List

11     The new Chapter 9 of the Washington state energy code includes a table of so-called

12  "options" for builders achieve higher energy efficiency performance. Exhibit A to the

13  Declaration of Timothy M. Harris. That table is designed to be a "pick list" for builders to use

14  in order to achieve certain levels of energy efficiency in a home. These "options" are

15  accompanied by "credits" that purport to track the expected level of energy saving for each

16  "option." Builders are required to achieve one "credit" from the "options" included in the

17  table. *Id.* This case concerns the question whether Chapter 9's "option" list is preempted by

18  federal law.

19     Under Chapter 9, "options" 1a and 2 explicitly require higher efficiency

20  equipment than set forth by federal standards. The current federal standard for furnaces is 78%

21  efficiency (42 U.S.C. ¶ 6295 and 6297), but "option" 1a under Chapter 9 require a high

22  efficiency furnace (92% efficiency). "Option" 2 prohibits direct combustion heating with

23  AFUE less than 80% -- in excess of federal standards.

24

25

26

1c is only available if there is zonal electric heating. 1b, closed-loop ground source heat pumps are extraordinarily expensive, not feasible in some areas, and only operate on electricity. Exhibit to the Declaration of Diane Glenn.

Chapter 9 "options" 3a, 3b and 3c concern the building envelope itself (windows and insulation). "Option" 3a is only worth a half point, so it would need to be combined with another "option" to qualify. "Options" 3a, 3b and 3c are not viable in many geographic circumstances, and many manufacturers do not offer products that meet the required specifications. Declaration of Ted Clifton at 4-5. Additionally, a builder may already meet the requirements of "options" 3a, 3b and 3c through compliance with Chapter 5, but must otherwise comply with the other "options" in Chapter 9. *Id.*

Chapter 9 "options" 4a and 4b concern ventilation and air leakage control. "Option" 4a is only worth half a point, so it would need to be combined with another "option" to qualify. "Option" 4b is impossible in many circumstances, and adds significantly to the cost of a home in many others. Declaration of Ted Clifton at 5-6.

Chapter 9 "options" 5a and 5b concern high efficiency heating and faucet flow. "Option" 5a is only worth half a point and would have to be combined with another "option" to qualify. Both 5a and 5b have sub-"options" that presume gas is available to the home, which is not always the case. For those without gas hookups, an upgraded higher-efficiency water heater must be used in the home. Compliance without gas therefore requires the installation of a costly tank-less water heater. Declaration of Ted Clifton at 6-7.

The current federal standard for water heating equipment are based on a formula whereby the most popular size (50 gallons for electric) results in a standard (energy factor) of

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

.88. For the most popular size of gas hot water heater (40 gallons), the standard (energy factor)

is .54. Therefore, applying the formula whereby tank size is factored in, "Options" 5a and 5b

require efficiencies in excess of federal standards. Declaration of Ted Clifton at 6.

"Option" 5a also requires the use of reduced faucet flow at a standard above federal

standard. For lavatory and kitchen faucets, as well as showerheads, the USDOE has a 2.2

gallon per minute (gpm) standard for all faucets. 63 Fed. Reg. 13307, 42 U.S.C. 6295 (j).

Table 9-1 "Option" 5 outlines a flow of 1.75 gpm or less for kitchen faucets and showerheads

and 1 gpm or less for all other lavatory faucets (which do not presently exist) -- exceeding

federal standards. Declaration of Ted Clifton at 6.

Chapter 9 "option" 6 is to build a home with less than 1,500 square feet. The same 1

point under "option" 6 is given for a 500-square foot house as a 1,499 square foot house.

Building such a small house is not an option in many circumstances.

Chapter 9 "option" 7 is not an option but a one-point penalty for all homes exceeding

5,000 square feet. Those individuals building homes in excess of 5,000 square feet must then

achieve two points under Chapter 9.

Chapter 9 "option" 8 provides a half credit for renewable electric energy (wind and

solar), which is not feasible in many geographic circumstances. "Option" 8 is most likely the

most expensive "option," and is therefore unlikely to be used in most circumstances.

Declaration of Ted Clifton at 7.

4.    USDOE's Role in Establishing Energy Standards

The federal energy efficiency and energy use standards for certain residential heating,

ventilation, air conditioning and plumbing products are governed by the Energy Policy and

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

Conservation Act of 1975 (EPCA), 42 U.S.C. § 6291 *et seq.* EPCA has been substantially amended twice – in 1987 and 1992. The EPCA sets forth directions for the United States Department of Energy (USDOE) to prescribe federal industry-wide baseline standards for 13 "covered products." USDOE is also tasked with periodically updating those standards. The list of "covered products" includes central air conditioners and heat pumps (42 U.S.C. § 6295(d)), water heaters, pool heaters and direct heating equipment (42 U.S.C. § 6295(e); furnaces and boilers (42 U.S.C. § 6295(f)); and plumbing products (42 U.S.C. § 6295(j)).

The USDOE updated the federal standards for air conditioners and heat pumps in 2001, which became effective in 2006. 10 C.F.R. 430.32(c)(2). Standards for residential furnaces and boilers are currently being revised by USDOE through its rulemaking process, with likely effective dates ranging from 2011 to 2015.

Analysis

Defendants' argument seems to be that if, under any imaginable circumstance, a builder can comply with chapter 9 without installing a product that exceeds federal regulations; there is no preemption –regardless of cost, feasibility or practicality. Defendants' Motion at 26 ("the burden is on BIAW to establish that no set of circumstances exist under which the [regulation] would be valid"). In fact, the legislative history show that Congress intended to preempt most state energy regulations, including those that "effectively" require the use of products that exceed federal standards. *See, e.g.,* H.R. Rep. 100-11 at 26 ("performance-based codes cannot expressly or effectively require the installation of covered products").

Another fatal problem with Chapter 9 is its uneven application – both from a cost and application perspective. The "options" contained therein vary widely in the projected energy

RESPONSE AND MOTION FOR
SUMMARY JUDGMENT

7

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

savings and/or are impossible to quantify. The cost of various options also varies widely, leaving the builder with little choice other than to install products that exceed federal standards.

    1.    <u>Congress Expressly Eschews a "Patchwork" of Energy Regulations.</u>

Congress adopted EPCA, and its subsequent amendments, in order to create stability for manufacturers and distributors. The preemption provisions were broadly framed because Congress wanted to "end an era of confusion and uncertainty" for the industry and "protect the appliance industry from having to comply with a patchwork of numerous conflicting state requirements." H.R. Rep. No. 100-11 at 24, 30. Congress recognized that such a "patchwork" would "increasingly complicate their design, production and marketing plans." S. Rep. No. 100-6 at 4 (1987). Congress intended that 42 U.S.C. § 6297 would "preempt[] state law in most circumstances." H.R. Rep. 100-11 at 19.

    2.    <u>Congress Intended to Preempt State Energy Codes in Most Cases</u>

"Congress may preempt state laws and regulations, no matter how well-intentioned and carefully considered they may be," when it has determined that "the United States must act as a single nation, led by the federal government," to achieve important national objectives. *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1239 (10th Cir. 2004). In this case, Congress was crystal clear: "no state regulation concerning the energy efficiency, energy use, or water use, of such covered product shall be effective with respect to such product," unless the regulation falls into an exception. 42 U.S.C. 6297 (c).

Preemption can occur in one of three ways: (1) express preemption by statute; (2) occupation of the field; or (3) conflict between state and federal regulation. *English v. General*

**GOODSTEIN LAW GROUP PLLC**
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

*Electric*, 496 U.S. 72, 78-79 (1990). This case unquestionably presents a question of express preemption, which turns on the interpretation of the federal statute that outlines when a state law is preempted. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 484-85 (1996). In such a case, the Court begins with the text of the provision in question and then moves on to the structure and purpose of the act in which it occurs. *See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995); *Air Conditioning, Heating and Refrigeration Institute (AHRI) v. City of Albuquerque*, 2008 WL 5586316 (D.N.M.) (ruling on injunction) (attached as exhibit D to the declaration of Timothy M. Harris).

Defendants argue that BIAW has the burden to prove "no circumstances exist" under which Chapter 9 would be valid. Defendants' Motion for Summary Judgment at 26. Defendants cite to a criminal case, *United States v. Salerno*, 481 U.S. 739 (1987), that does not consider the express preemption issue presented here. *Salerdo* deals with an argument that the Bail Reform Act runs afoul of the due process clause and the 8th amendment. There is no analogy to an express preemption case – such as this -- where Congress has laid out a roadmap to consider specific factors to determine whether a state law is preempted.

Defendants also recklessly cite to *California Coastal Commission v. Granite Rock Co.*, 480 U.S. 572, 593 (1995), to support their "no circumstances" theory. In that case, however, the court noted that "the language and history of the CZMA *expressly disclaim intent to pre-empt state regulation.*" The instant case presents the opposite situation: rather than disclaim intent to preempt, Congress stated that it does – in fact – intend to preempt state law. 42 U.S.C. § 6297(c). Defendants go on to selectively quote *Broardrick v. Oklahoma*, 413 U.S. 601, 613 (1973). That case involved the application of the overbreadth doctrine in the First

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

Amendment context. The court referred to a specific manner of applying the overbreadth doctrine as "manifestly strong medicine." *Id.* The *Broadrick* language quoted by Defendants does not apply here.

Under Defendants' stretched and unsupported "no circumstances" theory, Chapter 9 would not be preempted under the express terms of 42 U.S.C. 6297 if it had 12 conditions that require appliances exceeding the federal limits, and 1 absurd, costly, and impractical condition that does nothing to save energy but was within federal limits. The legislative history shows that's not what Congress intended. In fact, Congress set forth a detailed procedure for determining whether a state statute was preempted under the EPCA.

3.  Chapter 9 "Concerns" Energy Efficiency, Energy Use or Water Use.

The Energy Policy and Conservation Act of the Energy Policy Act of 1992 (EPCA), contains an express preemption provision that that prohibits state regulation "concerning" the energy efficiency, energy use, or water use of any covered product, with limited exceptions. 42 U.S.C. § 6297(c). "Concerning" is defined as "relating to." Blacks Law Dictionary 289 (6th ed. 1990). The Supreme Court has interpreted the "relating to" language to express a broad preemptive purpose. *See, e.g., Shaw v. Delta Air Lines*, 463 U.S. 85, 96 (1983) (applying the ERISA preemption of all state laws "insofar as they . . . related to any employee benefit plan," stating that the "breadth of [that provision's] pre-emptive reach is apparent from its language."); *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724 (1985) (ERISA preemptive clause has a "broad scope"); *AHRI* at 7.

The legislative history of 6297's broad preemption provision indicates that Congress intended to eliminate the separate systems of state appliance standards that had emerged as a

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

result of the U.S. Department of Energy's "general policy of granting petitions from States requesting waivers from preemption" that caused appliance manufacturers to be confronted with "a growing patchwork of differing State regulations which would increasingly complicate their design, production and marketing plans." S. Rep. No. 100-6; *AHRI* at 3 (ruling on preliminary injunction). "There is no doubt that Congress intended to preempt state regulation of the energy efficiency of certain building appliances in order to have uniform, express, national energy efficiency standards." *Id.*

EPCA provides limited exceptions to preemption. 42 U.S.C. at § 6297(f). The only exception to preemption relevant to the instant case applies when the regulation is in a building code for new construction and certain conditions are met. *Id.*

4.    The *AHRI* Case

The *Air Conditioning, Heating and Refrigeration Institute, et. al (AHRI) v. City of Albuquerque* case is illustrative here, as it is the only case involving the question of preemption of a local energy code by the EHRA. 2008 WL 5586316 (D.N.M.) (decision on preliminary injunction). Exhibit D to the Declaration of Timothy M. Harris. In *AHRI*, plaintiff trade associations and HVAC distributors challenged portions of three City of Albuquerque ordinances that impose minimum energy efficiency standards for commercial and residential buildings. The Plaintiffs argued those standards were preempted by EPCA. Plaintiffs sought and successfully obtained a preliminary injunction to prevent the challenged sections from going into effect. *Id.* at 13.

The Albuquerque energy code dealing with one and two family detached dwellings and townhouses sets forth various options: a builder can adhere to third-party

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

standard set forth under LEED certification or Build Green new Mexico; a builder can choose to make residential designs 30% more energy efficient than a "baseline building" which utilizes HVAC and water heating products that do not exceed the federal efficiency standards; a builder can also choose a performance-based option that requires the use of HVAC and water hearing products with energy efficiencies in excess of federal standards, along with other mandatory requirements such as caulking and sealing around doors and adequately supporting the joints in the ductwork. *Id.* There is also a prescriptive option which provides for energy efficiency standards that are consistent with federal standards.

On Sept. 30, 2010, The AHRI Court ruled on Summary Judgment (*AHRI II*), stating that "the prescriptive provisions of [the residential energy code] are regulations that concern the energy efficiency of covered products and, therefore are preempted as a matter of law." *AHRI II* at 8, Exhibit E to the Declaration of Timothy M. Harris. The Court also found that the plaintiffs failed to meet their burden on summary judgment to show the absence of a genuine material fact that the third-party LEED and Build Green New Mexico standards are preempted. Id. at 10-11. Washington's Code does not contemplate such third-party standards under LEED or a comparable "build green" program.

Defendants mistakenly argue the AHRI decision on summary judgment stands for the proposition that Congress favors "performance-based" standards (meaning the credits under chapter 9 are based on a percentage increase in energy efficiency rather than on prescriptive measures which set a standard in excess of the federal limits). Defendants' Motion for Summary Judgment at 40-41 ("Congress intended to exempt performance-based codes from preemption under EPCA"). Of course, express prescriptive restrictions are more clearly

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

1   preempted by federal regulations, but performance-based standards may be similarly

2   preempted if a builder cannot effectively comply with a state's standards without using

3   products that exceed the federal limits. The legislative history clearly shows that Congress

4   expressly intended to "preempt performance based codes that 'effectively' require the

5   installation of covered products whose efficiencies exceed the federal standard." H.R. Rep.

6   100-11 at 26.

7

8       5.      Chapter 9 is Preempted by the EPCA

9           Federal law outlines two routes for a state or local jurisdiction to qualify for an

10  exception to federal preemption. First, the USDOE can grant a waiver of preemption to a state,

11  if the state appeals to the Secretary of the USDOE and the Secretary finds that the state

12  regulation is needed to meet some "unusual or compelling state or local energy or water

13  interests," that are "substantially different in nature or magnitude that those prevailing in the

14  United States generally." 42 U.S.C. § 6297(d). *See* S. Rep. No. 100-6 ("achieving the waiver

15  is difficult"). Defendant State Building Code Council has not asked the USDOE secretary for

16  such a waiver of preemption.

17

18          The second option for the State Building Code to avoid preemption is commonly

19  referred to as the "building code" exception and is intended to allow state or local governments

20  to pursue "performance-based building code approaches." 42 U.S.C. § 6297(f); H.R. No. 100-

21  11 at 39. In order to qualify for this exception, the state or local code must meet every factor in

22  a strict seven-part test, set forth in 42 U.S.C. § 6297(f)(3)(A)-(G). This exception only

23  applies to new construction, not renovations.

24

25

26

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

The legislative history of the NAECA sheds light on Congress' purpose in including the "building code exception" for residential products at 42 U.S.C. § 6297 (f)(3). The House Report states that the building code exception was intended to "prevent[] state building codes from being used as a means of setting mandatory state appliance standards in excess of Federal Standards." H.R. Rep. 100-11 at 26. In addition, the flexibility provided to states in this provision was "limited" to ensure that performance-based codes cannot *expressly or effectively* require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard. . . ." H.R. Rep. 100-11 at 26 (emphasis added). Further, it was Congress' intent that qualifying building codes "follow a one-for-one equivalency as closely as possible to assure that the credits for exceeding Federal standards are even handed and not unfairly weighted resulting in undue pressure on builders to install covered products exceeding Federal standards." S. Rep. 100-6 at 11.

Chapter 9 cannot meet four of the Seven Factors set forth in 42 U.S.C. § 6297(f) because it expressly and/or effectively requires the installation of components that exceed the federal standard. Chapter 9 is therefore preempted. Factors one, four, and seven 42 U.S.C. § 6297 (f)(3)(A), (D) and (G), concerning baseline standards, selections of options that meet an energy efficiency objective and testing procedures are not at issue in this case.

    A.    <u>Chapter 9 Effectively Requires the Use of Products that Exceed Federal Standards.</u>

The second EPCA factor states that the code may not require that the covered product have an energy efficiency exceeding the applicable energy standard established [by U.S.C. § ch. 42]. The fifth (related) criterion states that if the state code sets forth one or more optional combinations of items that meet the energy consumption or conservation objective, for every

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

combination which includes a covered product, the efficiency of which exceeds federal standards, there must be at least an equal number of options that do not exceed the federal standard by more than 5 percent and one option that does not exceed the federal standard at all. 42 U.S.C. § 6297(f)(3)(E).

Defendant SBCC cannot meet the criterion second and fifth criteria. Under Chapter 9, if a builder does not use products that exceed federal efficiency standards, the builder must make other modifications to the home to increase its energy efficiency in order to comply with the code. This was the same situation in AHRI, where the Court stated "[t]hus, in effect, there is a penalty imposed for selecting products that meet, but do not exceed, federal energy standards. A building code that effectively requires the installation of products that exceed federal energy standards cannot satisfy this provision. *See, e.g.*, H.R. Rep. 100-11 at 26 (building code exception intended to 'ensure that performance-based codes cannot expressly *or effectively* require the installation of covered products whose efficiencies exceed . . . the applicable federal standard . . .')(emphasis added)." *AHRI* at 7.

As in *AHRI*, there is a penalty imposed under Chapter 9 for failure to use a product that exceeds federal standards. Defendants readily admit that compliance with the various "Options" in Chapter 9 result in added cost to the builder – and ultimately the consumer. *See, e.g.*, Declaration of Martha Rose at 6 ("in the last six years, it is my experience that the energy-efficient homes I build are roughly 10-20% more expensive to build than a home of comparable size that is not energy efficient, but homeowners will recover additional costs of an

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

energy-efficient home.");[1] Declaration of Gary Nordeen at 2-5. ("high performance windows are becoming cheaper"); ("the additional cost for the floor insulation increase is 18 cents per square foot"); ([the additional cost of additional R-4 rigid wall insulation] is 83 cents per square foot of wall area"); ("[the additional cost of R-12 insulation is $1.46 per square foot"); ("[t]oday, the equipment cost of an HRV will cost $500-$900 for an average size house").

Governor Christine Gregoire also acknowledged the additional expense of the new energy code regulations when she asked Defendant State Building Code Council to delay the effective date of the code because of concerns about the state's economy. The Governor also acknowledged the "increased costs" of improvements. Declaration of Timothy M. Harris, Exhibit C. Even Defendant Sate Building Code Council admitted that these new regulations were so costly they would have an impact on the state's economic recovery. Declaration of Timothy M. Harris, Exhibit D (Rule Making Order dated June 21, 2010).

Defendants concede that "options" 1a, 2, 5a and 5b exceed Federal standards. "Options" 1b, and 1c add significantly to the cost of the home, and compliance with those factors is bewildering and lacking in definition. For instance, 1c requires a "ductless" system, but some "ductless" heat pumps have a mini-ducted system as part of the "ductless" system, so compliance is unclear. "Option" 1c is also only available for homes using "zonal" electric heat. *See* the Declaration of Ted Clifton at 4.

---

[1] Ms. Rose's lofty assertion that homeowners will recover the added cost of their home through energy savings is practically impossible for an average homeowner with an average mortgage. A current code-minimum home will spend about $2,000 per year on total energy, which correlates to a monthly energy cost of about $167 per month. Compare this to the average monthly house payment (for a new 2,000 s/f house, with land) of about $2000 per month. Raising the monthly mortgage payment by just 10% (to accommodate the additional 10-20% cost of the house) would cost the homeowner an additional $200 per month. The result is an added cost of $200 per month to save $25.05 per month (using the 2009 energy code's expected 15% savings of the average $167

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

"Options" 3a, 3b 3c, 4a and 4b are false choices. A builder may comply with chapter five by creating an efficient building envelope that already meets the criteria in those sections of Chapter 9, yet they would still be required to otherwise meet the requirements of Chapter 9 by complying with other "Options." *See* the Declaration of Ted Clifton at 7. If a builder proceeds under Chapter 5, in many cases, they only have the "option" to use a product that exceeds federal standards or build a house under 1,500 square feet. In any event, compliance with the "options" under 3a-c and 4a-b would add significantly to the cost of the home, creating a significant penalty for failure to use products that exceed federal standards. *Id.* Also, the materials required in those "options" are not readily available. *Id.*

For instance, many window manufacturers do not have windows that have a U-value of .25 or better, as contemplated in "Options" 3b and 3c. Neither does any manufacturer that does not employ triple-glazing, which encompasses a significant share of the manufacturers (triple glaze windows would be required to meet 3b). Declaration Ted Clifton at 5. For a 2,900 square foot house, the triple-glazed windows would cost about $1,900 more, and would only save the customer only about $4.50 per month, using the Washington State University Component worksheet (chapter five). *Id.* Also, R-10 slab insulation costs about $1 per square foot for the raw building materials, and approximately another $1 per square foot more for the installation. *Id. See also* the Exhibit to the Declaration of Diane Glenn.

Further, Chapter 9's "Option" 3b calls for R-21 wall insulation, with R-4 foam sheeting on the outside. Such a combination will cause the walls to sweat, condensing moisture on the

power bill). The added cost is completely unjustifiable from an energy conservation standpoint. *See* the Declaration of Ted Clifton at 9.

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

backside of the foam insulation inside each stud cavity if used in western Washington. This would cause immediate and irreparable harm to both homeowners and builders alike. Declaration of Ted Clifton at 4-5. "Option" 3b is therefore unworkable in many parts of the state. "Options" 3b and 3c are also not viable options because of these issues with the walls and low U value of windows: If the component performance method is used to comply using these "options," then the builder would need to upgrade on the heating or water system to get away from the extremes of building the envelope -- they would then be forced to utilize systems that exceed the federal standard. *Id. See also* the Declaration of Diane Glenn.

"Option" 5a only accounts for a half of a point, so compliance with that section alone fails to meet the requirements of Chapter 9. Defendants concede that "Option" 5b requires installation of a product that exceeds federal standards. Table 1 of the Ecotope Study also states that both "Options" 5a-b refer "to equipment covered under ECPA with established minimum performance standards, impacted by Chapter 9." Exhibit F to the Declaration of Timothy M. Harris.

In any event, "Option" 5a requires reduced faucet flow -- 1.75 gallons per minute for showerhead and kitchen sink faucets -- at a level that is more restrictive than the federal standard. 42 U.S.C. 6295(j) ("The maximum water use allowed for any showerhead manufactured after January 1, 1994, is 2.5 gallons per minute when measured at a flowing water pressure of 80 pounds per square inch"). "Option" 5a also requires lavatory faucets rated at 1.0 GPM or less. The federal standard is 2.5 GPM. 42 U.S.C. 6295(j). Declaration of Ted Clifton at 6.

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

"Option" 6 provides a point for constructing a home with less than 1,500 square feet in floor area with less than 300 square feet of window and door area. This "option" is simply unworkable in many circumstances. The same is true of "option" 8, which only provides a half credit for renewable electric energy (solar or wind) which is not viable for many parts of the state – and would be prohibitively expensive. Declaration of Ted Clifton at 7.

Finally, there is a significant cost penalty associated with avoiding Chapter 9 altogether and simply choosing to meet the energy code standards set forth in Chapter 4. The complex computer modeling required in Chapter 4 would result in added cost of approximately $1,000 per house. *Id.*

Therefore, the second and fifth requirements for an exemption to preemption cannot be met. 42 U.S.C. § 6297(f)(3)(E). Chapter 9 effectively requires the use of products that exceed the federal standard. The "Options" set forth either call for the use of such a product (Options 1a, 1b, 2, 5a and 5b) are false choices (options 3a 3b, 3c, 4a and 4b cannot be used if the builder complies with the envelope mandates of Chapter 5); or are only worth a half credit ("Options" 3a, 4a, 5a and 8) or are sometimes impossible (depending, for instance, on climate, geography or availability of gas – Options 1c, 5a and 8).

B.     Chapter 9's Inequitable Cost and Credit Distribution Creates Undue Pressure to Exceed Federal Standards.

The third ECPA factor states that options must be weighed on a one-for –one equivalent energy use or equivalent cost basis. 42 U.S.C. §6297 (f)(3)(C). Defendants cannot show that Chapter 9 complies with this criterion. The Legislative History of the EPCA calls on local and state energy codes to "follow a one-for-one equivalency as closely as possible to assure that the credits for exceeding Federal standards are even handed and not unfairly

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

weighted resulting in undue pressure on builders to install covered products exceeding Federal standards." S. Rep. 100-6 at 11. Chapter 9 fails this test.

In fact, the Ecotope tables show, rather clearly, that there is a wide disparity in distribution of credits.[2] For example, in Table 1, they show the Ground Source heat pump ("option" 1b) as offering 6% improvement per point, while they claim the 4a Air Leakage Control & Heat Recovery Ventilation to offer 10% per point, a 40% deviation between the two. *See* the Declaration of Timothy M. Harris, at Exhibit F.

The purported savings under Table 1 don't add up. The water heater "options" listed under "options" 5a and 5b cannot possibly represent 9% (5a) or 6% (5b) in energy savings as stated in Table 1. For instance, water heating is only about 17% of the average energy use of a home. Improving the efficiency of a gas water heater from the 58% standard to 62% as contemplated in "option" 5a improves efficiency by about 7% -- but 7% of 17% is only **1.19%**. Declaration of Ted Clifton at 6.

Testimony provided to the Building Code Council questioned the number of credits assigned to each "option." *See, e.g.*, Exhibit G to the Declaration of Timothy M. Harris (Letter from The Air Conditioning, Heating and Refrigeration Institute to the Chair of the Building Code Council) (" we fail to see how an 8.5 HSPF heat pump has twice the number of credits than the efficient building option. . . . [Chapter 9] could indirectly force homeowners to install high efficiency HVAC and water heating equipment . . . .The credits given to heat pumps for

---

[2] The purported energy savings in Chapter 9 is expressed in an analysis of the options conducted by Ecotope, Inc. and summarized in Table 1 and 2. This analysis represents the final version of Chapter 9 energy codes as adopted by the Building Code Council. See Defendants' Declaration of Tim Nogler at 6.

1  example will undoubtedly push homebuilders to opt for that option instead of choosing the

2  efficient building envelope option").

3      More disconcerting is "Option" 6, concerning the 1 point credit for small dwellings

4  (under 1,500 square feet). Table 1 states: "building heating and cooling energy use strongly

5  depend on building size with larger buildings having greater surface area and greater energy

6  use. No specific savings percentage is given due to the challenge in comparing a wide range of

7  house sizes." In other words, even the experts have no idea how much of a savings percentage

8  will result for the one point in "Option" 6.

9      Rather than a one-for-one equivalent energy use or cost basis, table 1 demonstrates a

10  haphazard assignment of points, with a range of 6% savings per point (Option 2) to 11%

11  savings per point (option 8) to an admittedly undetermined amount of savings per point

12  (Option 6) to an artificially inflated amount (Options 5a and 5b) to various savings percentages

13  in between. While Congress stated the obvious point that *exact* equivalency is not possible, S.

14  Rep. No. 100-6 at 10, the credits must be "based as closely as possible." *Id.* The wide

15  disparity shows they are not as "close as possible."

16      Defendants state that the average of each "credit" achieves approximately an eight

17  percent reduction in total building energy use. Defendants' Motion at 34. However, 42 U.S.C.

18  6297 (f)(3)(B) expressly requires a "one-for-one equivalent energy use or equivalent cost

19  basis" – not an average of all options. In fact, Chapter 9 purports to provide an additional 8%

20  savings in energy efficiency, when it actually provides as a wide range of energy savings,

21  depending on the means used to achieve each credit. *See* Table 1 of the Ecotope Study,

22  Exhibit F to the Declaration of Timothy M. Harris. Some of the "options" also contain

RESPONSE AND MOTION FOR
SUMMARY JUDGMENT

21

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

assumptions that call into question the energy efficiency. *E.g.*, "Options" 5a and 5b, concerning the efficiency of water heaters, will vary widely, depending on the size of the house and the number of residents. The values set forth in Table 1 are therefore not credible.

There is also a wide disparity of costs associated with complying with Chapter 9 – and the cheapest way to comply with that Chapter is to simply install high efficiency HVAC equipment under "Option" 1a. See the Declaration of Ted Clifton at 4. In other words, *the most cost effective route to comply with chapter 9 is to install a product that exceeds federal standards. See also* the Declaration of Diane Glenn. This is precisely the type of "undue pressure" to exceed federal standards Congress was concerned about when passing EPCA, and creating a narrow exemption to preemption. *See* S. Rep. 100-6 at 11.

      C.    The 2009 Energy Code Fails to State Energy Conservation in Terms of Total Energy Consumption.

The sixth requirement is set forth in 42 U.S.C. § 6297(f)(3)(F) is that the code must state energy consumption or conservation in terms of estimated total consumption of energy. Chapter 9 fails to do so. The 2009 Energy Code measures performance based not on the total consumption but on an inconsistent point system that fails to directly relate to energy savings. As is demonstrated *supra* under the third EPCA factor, the energy consumption or conservation is based on a loose set of values, with percentage savings ranging from six to 11 percent to incalculable figures related to house sizes under 1,500 square feet and water heater standards that fail to account for house size and number of residents.

RESPONSE AND MOTION FOR
SUMMARY JUDGMENT

22

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

Conclusion

For the foregoing reasons, Plaintiffs Building Industry Association of Washington, *et. al,* request that this court find Chapter 9 of the 2009 Washington Energy Code is preempted by the EPCA, and grant Plaintiffs' requested injunctive relief preventing Chapter 9 from going into effect. The Court should accordingly deny Defendants' Motion for Summary Judgment and grant Plaintiffs' Cross-Motion for Summary Judgment.

Dated this 10th day of December, 2010.


Timothy M. Harris
WSBA 29906
Attorneys for Plaintiff Building Industry Association of
Washington et al.

RESPONSE AND MOTION FOR
SUMMARY JUDGMENT

23

GOODSTEIN LAW GROUP PLLC
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## CERTIFICATE OF SERVICE

I hereby certify that on July 20, 2010, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

following:

Ann Essko
Sandra Adix
Assistant Attorneys General
AnnE@atg.wa.gov
SandraA@atg.wa.gov

Amanda Goodin
Kristen L. Boyles
Earthjustice
agoodin@earthjustice.org
kboyles@earthjustice.org

Vivian H.W. Wang
Nathanial S.W. Lawrence
Natural Resources Defense Council, Inc.
vwang@nrdc.org
nlawrence@nrdc.org

I certify under penalty of perjury under the laws of the state of Washington that the

foregoing is true and correct.

Dated this 10th day of December, 2010, at Tacoma, Washington.

Timothy M. Harris

RESPONSE AND MOTION FOR
SUMMARY JUDGMENT

24

**GOODSTEIN LAW GROUP PLLC**
501 S. G Street
Tacoma, WA 98405
Telephone: (253) 779-4000
Facsimile: (253) 779-4411